UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FOREST LEWIS, DEBORAH LEWIS,
KELLIE KRETCHMER, VICTOR BAKER,
JUDITH BAKER, ANTHONY GAGLIARDI and
JANE GAGLIARDI, *individually and as Parents of*
*Tyler Gagliardi, infant*, GREGORY RYDZA,
SUSAN RYDZA, ASHLEY RYDZA,
JEREMY RYDZA and JESSIE DIPIRRO,

                    Plaintiffs,

        v.                                          **DECISION AND ORDER**
                                                        04-CV-331S
FMC CORPORATION,

                    Defendant.

## I.  INTRODUCTION

        Plaintiffs, residents of the Village of Middleport, Niagara County, New York,

commenced this citizen suit on April 30, 2004, asserting claims under the Resource

Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6901 *et seq*., the Clean

Water Act (CWA), 33 U.S.C. §§ 1251, *et seq*., and the common law of the State of New

York.  They seek injunctive relief, damages, and the imposition of civil penalties against

Defendant FMC Corporation for its alleged violations of federal environmental law on real

property located in the Village of Middleport.

        Presently before the Court is FMC's Motion to Preclude Plaintiffs' Expert and for

Summary Judgment.  (Docket No.  85.)[1]  Plaintiffs oppose the motion.[2]   For the reasons

---

[1]  In support of its motion, FMC has filed a number of Declarations (Docket Nos.  90, and 91 with exhibits, and 86-89 without exhibits), a Statement of Facts not in Dispute (Docket No.  93), Memorandum of Law (Docket No.  94), Reply Declaration (Docket No. 138), Reply Memorandum of Law (Docket No.

1

stated below, FMC's motion is granted in its entirety.

## II.  BACKGROUND

### A.    Facts

It is noted at the outset that Plaintiffs did not file the requisite response to FMC's Local Rule 56.1 statement of undisputed facts.  Thus, unless FMC's stated facts are unsupported, they are deemed admitted.  The facts below are taken from the pleadings, to the extent they are in agreement, and from FMC's Rule 56.1 statement and supporting documents.

### 1.    *The Site and Surrounding Areas*

FMC owns and operates a pesticide formulations facility (the Facility) situated on approximately 91 acres in Middleport, New York.  The northern portion of the Facility (comprising approximately 52 acres) was used for the manufacture and/or formulation of pesticide products beginning in the 1920s.[3]  (Docket No. 8, Ex. 3 at 030112, 030131.)  As a result of pre-1974 waste handling practices, soils and groundwater in the northern half of the Facility were extensively contaminated.  (*Id.* at 030065.)  Investigations have identified 54 solid waste management units (SWMUs) at the Facility.  (Docket Nos. 1 ¶ 27;

---

139), Declaration in Response to Plaintiff's Sur-Reply (Docket No. 157), and Memorandum in Opposition to Plaintiffs' Supplemental Submission (Docket No. 164).

[2]  This Court issued a prior decision striking certain of Plaintiffs' filings.  (Docket No. 156.) Accordingly, Plaintiffs' opposing submissions preliminarily include the Declaration of Dr. Dharmarajan Iyer, dated January 28, 2008 (Docket No. 134), with Exhibits (Docket No. 132), a Memorandum of Law (Docket No. 141), the Affidavit of Charles D. Grieco, Esq., sworn to Jan. 22, 2010, with supplemental Exhibits A-E (Docket No. 162), and a Supplemental Memorandum of Law (Docket No. 163).

[3]  No pesticide formulation occurs on the approximately 39 acres constituting the southern portion of the Facility.

4 ¶ 27[4]; 84 Ex. 3 at 030121-22, 030390-91.)  Of particular concern in this litigation is the potential migration of, and harm from, arsenic present at the Facility.

Situated on the northern half of the Facility are, among other things, buildings used for formulating and storing pesticides, a water treatment plant and associated holding tanks, a western surface impoundment area, a former central surface impoundment area, and an eastern surface impoundment area.  (*Id*. at 030112, 030531.)

Adjacent to the Facility's northern boundary is a former Conrail right-of-way, running in an east-west direction, which FMC acquired in or about 2000.  (*Id*. at 030531; and Pldgs. ¶ 131.)  There are ditches on each side of the railroad bed and tracks—the "North Ditch" and the "South Ditch"—which together are referred to as the "Northern Ditches."  (Pldgs. ¶ 132.)  The Royalton-Hartland (Roy-Hart) Junior Senior High School and Elementary School are located to the north and northeast of the Facility, immediately north of the former Conrail right-of-way.  (Docket No. 84, Ex. 3 at 030111.)  To the west of Roy-Hart, and also immediately north of the former Conrail right-of-way, are eight separately owned parcels of land which together comprise the "Area 2 North Commercial Area."  (Docket Nos. 1 ¶ 89; 91 ¶¶ 3-8.)  Residential properties are adjacent to the Facility's western boundary.  (*Id*.)

### 2.    *The Administrative Order on Consent*

In 1991, the United States Environmental Protection Agency (EPA), the New York State Department of Environmental Conservation (DEC),[5] and FMC entered into an

---

[4]  Further citations to the Complaint (Docket No.  1) and Answer (Docket No.  4) will be referred to collectively as "Pldgs.  ¶ __."

[5]  EPA, DEC, and other involved government agencies are referred to collectively as "the Agencies."

Administrative Order on Consent (AOC) pursuant to Section 3008(h) of RCRA and Section 71-2727(3) of the New York State Environmental Conservation Law (ECL).  (Docket No. 4, Ex. B (the AOC).)   The purpose of the AOC is "to protect human health and the environment from releases of hazardous waste . . . and hazardous constituents . . . at or from [FMC's] Facility" in Middleport, New York, and it "requires, at a minimum, Interim Corrective Measures, and the performance by [FMC] of a RCRA Facility Investigation (RFI), to determine fully the nature and extent of any release(s) of hazardous waste and/or hazardous constituents from the Facility into the environment and to gather necessary data to support the Corrective Measures Study, if one is deemed necessary."   (AOC at 5.)   In addition, the AOC requires the development and implementation of a groundwater monitoring program.  It provides for use of the western surface impoundment as an interim corrective measure and postpones closure of the eastern and western surface impoundments pending completion of the RFI and, if necessary, the CMS.  (AOC at 6.)

In or about January 1999, the EPA accepted an RFI prepared by consultants for FMC, the stated objectives of which were to determine the nature and extent of releases of hazardous wastes or hazardous constituents from regulated units, SWMUs, and other source areas at the Facility and to gather all necessary data to support the Corrective Measures Study, if one is determined to be necessary.  (Pldgs.  ¶¶ 56-57.)

3.     *Relevant Remediation Activities and Status*

FMC has performed and/or contracted for a number of studies and remedial actions under the AOC.  What follows is not a complete discussion of those activities.  Rather, the focus is on the particular properties and areas referenced in the Complaint.

4

a.      The Three Surface Impoundments

In 1985, DEC notified FMC that the Facility's three surface impoundment areas were considered RCRA-regulated hazardous waste management units.  (Docket Nos. 84, Ex. 3 at 030178-79; 90 ¶ 15.)  In 1986, FMC submitted to the DEC a plan of closure for the three impoundment areas, which now are covered by the corrective action program being performed pursuant to the 1991 AOC.  (*Id*.)

The western surface impoundment (SWMU #4) was closed as a hazardous waste management unit in 1988, and retrofitted for use as a surface water management impoundment.  (Docket No. 84, Ex. E at 030179-81.)  The AOC now provides for continued use of the retrofitted western impoundment as an interim corrective measure (ICM) for the collection and storage of stormwater runoff from the northern portion of the Facility.  (*Id*. at 030180; AOC § VI(6)(j).)

The central surface impoundment (SWMU #49) was closed as a hazardous waste management unit in 1989 by excavating contaminated soil, replacing it with clean fill, and constructing a low permeability cover which is maintained as part of a site cover operation and maintenance program.  (Docket Nos. 84, Ex. 3 at 030181-83; 90 ¶ 16.)

FMC ceased using the eastern surface impoundment (SWMU #50) as a surface water management unit in 1987.   The Agencies approved the use of the eastern impoundment area for the temporary management of contaminated soils generated from off-Facility ICMs.  (*Id*. Ex. 3 at 030183; Ex. 4 at 28-29.)  As of August 16, 2007, FMC and the Agencies were discussing whether the eastern impoundment should be designated as a corrective action management unit (CAMU), which is a specially designated area used for the long-term management of corrective action waste generated by other parts of the

project.  (Docket No. 90 ¶ 16.)

Final status of the impoundment areas will be determined through the AOC and any CMS performed.  (*Id*.)  FMC has complied with the financial assurance requirements applicable to the estimated closure and post-closure care of the three impoundment areas, and the DEC has accepted FMC's financial assurance mechanism.  (*Id*. ¶ 17.)

b.    The Roy-Hart Property

In 1996, the bleacher area of the Roy-Hart school property was remediated by removing soil to a depth of approximately 2 feet.  (Docket No. 84, ex. 4 at 125.)  The Roy-Hart football field, track, and school bus garage areas were remediated between June 1999 and September 2000 by removing soil from a depth of .5 feet to 14 feet and constructing new athletic fields.  (Docket No.  84, Ex.  3 at 032955, 032962.)  In total, soil was removed from approximately 8.5 acres.  (Docket No. 84, Ex. 17 at GE0007234-36.)

By letter to the Roy-Hart Superintendent of Schools dated May 26, 2000, the DEC, on behalf of itself, the EPA, and the New York State Department of Health (DOH), advised that "the entire school yard is suitable for both athletic and non-athletic uses by all school children in terms of their exposure to known schoolyard soil arsenic levels."  (Docket No. 162-4 at 5-6 (emphasis in original).)  In response to an inquiry from Plaintiffs' counsel, the Agencies, in October 2005, restated their May 2000 assessment and advised that no new information had been received that would cause the agencies to alter the prior risk assessment.  (Docket No. 84, Ex. 17 at GE0007234-36.)  By letter to the Roy-Hart School Board, dated November 3, 2009, the agencies again advised that they "continue to stand by that original [May 2000] determination, and we have no new information that would cause us to alter it with respect to the school children's exposure to school yard soil arsenic

levels."  (Docket No. 162-4 at 1-2.)

However, the agencies went on to note that certain soil samples taken from the unremediated portions of school property exceed the 20 parts per million (ppm) arsenic background level expected in Middleport soils absent a contamination source.  (*Id*. at 2.) For that reason, the school property will be included in FMC's CMS.  The CMS will evaluate what, if any, unremediated areas will require corrective measures and the type of corrective measures FMC will be required to perform.  (*Id*.)

        c.     <u>The Northern Ditches</u>

When this action was commenced, stormwater from the North Ditch and the eastern portion of the South Ditch flowed into Culvert 105, which drains into Tributary One of Jeddo Creek, then into Jeddo Creek, a perenially flowing stream which joins Johnson Creek. Johnson Creek, in turn, drains to Lake Ontario.  (*Id*. ¶¶ 101, 120, 132, 156.)

The area designated as the Northern Ditches was fully remediated in 2005 as an interim corrective measure pursuant to the AOC, with the Agencies' oversight.  (Docket Nos. 84, Ex. 24 at 2-2 to 2-4; 90 ¶¶ 4-5.)  As a result, contaminants historically associated with conditions along the Northern Ditches' banks and in its sediments have been removed and/or covered under an engineered cover system, and permanent erosion and sediment control structures were installed.  (Docket Nos. 84, Ex.4 at 36;  90 ¶ 5.)  Since completion, no surface water originating on the Facility flows to the Northern Ditches.  (Docket No. 90 ¶ 5.)

        d.     <u>Stormwater</u>

Stormwater from the northern portion of the Facility is funneled to the western surface impoundment via a drainage swale system.  (*Id*.)  FMC has a State Pollutant

Discharge Elimination System (SPDES) Permit for its Middleport Facility.  (Pldgs. ¶ 163.)
Stormwater collected in the western impoundment is treated and discharged to Tributary
One via a point source discharge pursuant to the Facility's SPDES permit.  (*Id*. ¶ 154;
Docket No. 84, Ex. 3 at 030113, 030147.)   From time to time, SPDES permit
exceedances have occurred due to overflows from the western surface impoundment
during particularly heavy rainfall or snow melt events.  (Docket No. 90, ¶¶12-14.)  FMC
began upgrading its treatment plant in 2007 to, among other things, maximize flow rate and
operational efficiency.  The upgrades were nearing completion as of July 2009.  (Docket
No. 162-2 at 2.)

> e.   Residential Properties

In 2003, an interim corrective measure was taken with regard to 14 residential
properties immediately to the west of the Facility which resulted in the excavation of
approximately 15,000 cubic yards of soil.  (Docket No. 84, Ex. 4 at 31, 37.)  Ten of the
properties are adjacent to the western boundary of the Facility's northern half, and four are
located immediately west of those adjacent properties, between Main Street and So.
Vernon Street.  (*Id*. at 55 and Appdx. D at 22-23.)  The ICM also included a right-of-way
along So. Vernon Street and a 10 foot buffer area east of the remediated So. Vernon
Street properties.  (*Id*.)  A former outfall sewer line, which had carried treated water from
the Facility to Tributary One, also was removed.  (*Id*. at 55-56.)

Plaintiffs' properties are located to the west of the Facility, but are not within the
geographic area covered by the 2003 ICM.  (*Id*. at 8, 51.).

    f. <u>Area 2</u>

On August 6, 2007, early action remedial work began on the parcel of land at the easternmost end of Area 2, pursuant to a work plan approved by the Agencies. (Docket No. 90 ¶¶ 6-8.) As of August 16, 2007, FMC and the Agencies remained in discussions regarding appropriate corrective actions to be taken on the remainder of Area 2, with work expected to begin in or after the Summer of 2008. (*Id*. ¶ 9.)

**B.** **Procedural Background**

  **1.** ***The Complaint***

Plaintiffs commenced this action on April 30, 2004, asserting the following nine claims: (1) contamination from FMC presents an imminent and substantial endangerment to human health and the environment, (2) FMC is violating DEC regulations with regard to its three surface impoundment areas and such violations constitute open dumping prohibited by RCRA, (3) FMC is disposing of solid waste within "Area 2" and the "Northern Ditches" in violation of RCRA's open dumping prohibition, (4) FMC is allowing and has allowed the discharge of polluted storm waters from Area 2 and the Northern Ditches into waters of the United States in violation of the CWA, (5) FMC's discharge of polluted storm waters from the Northern Ditches has occurred without a permit in violation of the CWA, (6) FMC has exceeded the effluent limitation for arsenic established in its SPDES permit in violation of the CWA, (7) contaminants migrating from FMC onto Plaintiffs' real property interfere with their reasonable use and enjoyment, thereby constituting a private nuisance, (8) contaminants migrating from FMC into overburden and groundwater threaten the health of humans, animals and wildlife, thereby constituting a public nuisance, and (9) Plaintiffs

have sustained personal injuries, and the value of their real and personal property has

been diminished, due to FMC's contamination and other acts and omissions.

### 2. *The Experts*

FMC retained four experts in connection with this lawsuit:

- Dr.  Neil Ram obtained his Ph.D in environmental engineering in 1979, and
  has been retained to provide opinions on (a) the adequacy and timeliness of
  responsive actions taken by FMC at its Middleport Facility, (b) the opinions
  proferred by Plaintiffs' expert, and (c) FMC's alleged violations of its SPDES
  permit for discharges to Tributary One (Docket No.  86, ¶¶ 1, 7)

- Dr.  Rosalind Schoof obtained her Ph.D. in toxicology in 1982, and has been
  retained to provide opinions concerning Plaintiffs' allegations of adverse
  health effects resulting from releases of arsenic and other chemicals from
  FMC's Middleport Facility (Docket No.  87, ¶¶ 1,3)

- Dr.  Teresa S.  Bowers obtained her Ph.D. in geochemistry in 1982, and has
  been retained to provide opinions on the typical background levels of arsenic
  in soil, and to compare site contamination with background levels (Docket
  No.  88, ¶¶ 1, 3)

- James R.  Bird, a residential real estate appraiser certified in the State of
  New York, has been retained to conduct appraisals and prepare reports
  relative to the market values of four properties in Middleport owned by
  certain plaintiffs (Docket No.  89, ¶¶ 1,3).

Plaintiffs retained one expert:

- Dr. Dharmarajan R. Iyer obtained his Ph.D. in civil and environmental
  engineering in 1984, and has been retained to provide "fact and opinion
  testimony on various facets of this litigation" (Docket No.  134, ¶¶ 1, 3).

### 3. *The Pending Motion*

Relying on, *inter alia*, declarations and reports from its experts, FMC seeks an order

precluding Dr. Iyer's testimony and granting summary judgment dismissing this action in

its entirety.  In opposition, Plaintiffs submitted a declaration from Dr. Iyer relative to his

expertise and opinions, and a memorandum responding to certain of FMC's arguments.

Both sides have filed supplemental briefing, as well.   The preclusion issue will be considered first.

## III.  DISCUSSION

### A.    Plaintiffs' Expert

In connection with this litigation, Dr. Iyer has prepared: (1) a memorandum dated October 31, 2006, regarding "Soil/Groundwater Sampling at 44. S. Vernon Road, Middleport, NY" (the S. Vernon Memo), (2) a written report under Fed. R. Civ. P. 26, dated January 31, 2007 (the 2007 Report), (3) a memorandum dated March 31, 2007, regarding "Review of SPDES Discharge Monitoring Reports" (the SPDES Memo) (4) a memorandum dated March 31, 2007, regarding "FMC's Spring 2006 Downstream Sediment Sampling Data" (the Sediment Memo) and (5) a memorandum dated March 31, 2007, regarding "Chronology of FMC's Remedial Activities and Expected Cleanup Duration" (the Cleanup Memo).[6]  (Docket No. 84, Exs. 11-15.)  Dr. Iyer was deposed and has filed a responding declaration.  (*Id.* Ex. 16; Docket No. 134).

FMC has moved to preclude Dr. Iyer's testimony, memoranda, and report from consideration under the <u>Daubert</u>[7] line of cases on the grounds that: (1) he is not qualified to offer expert testimony in this case, (2) his submissions do not meet the threshold requirements set forth in the Federal Rules of Civil Procedure, and (3) his stated opinions rest on factual errors, unsubstantiated generalizations, speculative hypotheses, and subjective evaluations that render the opinions unreliable.  FMC does not address every

---

[6]  The three March 31, 2007 memoranda, which are based on additional documents not available to Dr. Iyer when he prepared his January 31, 2007 report, supplement the Rule 26 report.  (Docket No. 76.)

[7]  <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

opinion advanced by Dr. Iyer, but argues that the totality of the deficiencies it identifies invalidates his opinions in their entirety.    Plaintiffs have responded with Dr. Iyer's declaration dated January 28, 2008.

Under Rule 26(a)(2)(B) of the Federal Ruled of Civil Procedure, an expert's written report must contain, among other things: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them."  FED. R. CIV. P. 26(A)(2)(B); *see* Major v. Astrazeneca, Inc., No. 5:01-CV-618, 2006 U.S. Dist. LEXIS 65225, at *9 (N.D.N.Y. Sept. 13, 2006).  Parties have a duty to supplement their Rule 26(a) disclosures in a timely manner, including with regard to information included in an expert's report or deposition testimony.  FED. R. CIV. P. 26(e).

Assuming the disclosure requirements are met, district courts then must evaluate the expert testimony in accordance with Rule 702 of the Federal Rules of Evidence.  To do so, a court must first determine "whether the proposed witness qualifies as an expert." Baker v. Urban Outfitters, Inc., 254 F.Supp. 2d 346, 352 (S.D.N.Y. 2003); FED. R. EVID. 702 ("a witness [is] qualified as an expert by [his or her] knowledge, skill, experience, training, or education"); Stagl v. Delta Air Lines, 117 F.3d 76, 82 (2d Cir. 1997) (expert knowledge under Rule 702 involves information beyond the knowledge of an average juror).  If the witness qualifies, the court must then ensure that any scientific, technical, or other specialized expert testimony is both reliable and relevant to the matter at hand.  FED. R. EVID. 702; Daubert, 509 U.S. at 597.  In making this assessment, courts should consider the three factors specified in FED. R. EVID. 702—*i.e.*, "whether (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  FED. R. EVID. 702.  Other indicia of reliability, such as: "(1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) 'the technique's known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community," also may be considered.  Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004) (quoting Daubert, 509 U.S. at 593-94).

The same principles governing the admissibility of evidence at trial govern the admissibility of expert submissions on summary judgment.  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (citations omitted).  The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence, Baker, 254 F. Supp. 2d at 253, and such testimony should be excluded altogether if the court concludes there is "simply too great an analytical gap between the data and the opinion proffered," General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

### 1.    *Dr. Iyer's Qualifications*

Dr. Iyer annexed his *Curriculum Vitae* (CV) to his Fed. R. Civ. P. 26 expert report, as evidence of his qualifications.  (Docket No. 84, Ex. 12.)  There is no dispute as to his educational credentials, nor does FMC take issue with the Dr. Iyer's stated experience on solid/hazardous waste and wastewater projects, including the performance of investigation, design, remediation, and compliance-related services.  Consistent with his CV, Dr. Iyer testified that he considers himself an expert in the remediation of soil and groundwater,

13

and in treatment processes for water and soil.  (*Id*. Ex. 16 at 13.)

FMC does not deny that activities at its Middleport Facility have contaminated soil and water, and that all claims in this action arise from the alleged contamination.  Because Dr. Iyer has specialized knowledge, experience, and education in remediation of contaminated soil and water and related treatment processes, he is qualified to offer opinions on these particular topics to the extent his opinions are both reliable and relevant.

### 2.   *Reliability and Relevance of Dr. Iyer's Testimony*

The Court now turns to the question of whether, having preliminarily determined that Dr. Iyer is qualified to offer opinions in the specified areas, his submissions and testimony are reliable and relevant to the issues of this case.  FMC contends that his submissions do not meet the threshold requirements of FED. R. CIV. P. 26, nor do they meet the reliability requirements of FED. R. EVID. 702.

Dr. Iyer's January 31, 2007 report and the related and supplemental memoranda together address five topics: (1) imminent and substantial endangerment, (2) closure and post-closure plans, (3) SPDES permit exceedances, (4) RCRA open dumps, and (5) average cleanup duration.  His statements with respect to each, along with FMC's objections, are discussed below.

### a.   Imminent and Substantial Endangerment

Dr. Iyer bases his opinion that contamination from FMC presents an imminent and substantial endangerment to human health and the environment on a discussion of the Roy-Hart School property, stormwater discharges, Plaintiffs' residences, bioavailability of arsenic, and screening levels for soil arsenic.

14

i.    *The Roy-Hart Property*

According to Dr. Iyer, "[a]dditional investigation and probably remediation appears to be warranted on the [Roy-Hart] property."  The stated bases for this conclusion are that: (1) a 1996 Supplemental Dispersion Modeling Study did not predict vertical downward migration of contaminants in the soil, (2) the Agencies accepted a 30 mg/kg cleanup objective for arsenic for the remediation work conducted in 1999 when, under DEC's TAGM 4046, the soil cleanup objective for arsenic is the higher of 7.5 mg/kg or background level, which should be no higher than 10 mg/kg, and (3) "there is quite possibly recontamination of the surface soils" of the football field through surface water flooding and possibly groundwater.  (*Id.* at 17-18.)  Dr. Iyer states that *a "risk assessment . . . ultimately must be done to evaluate and select permanent remedies."*  (*Id.* at 17.)

ii.    *Stormwater*

Dr. Iyer opines that "FMC Corporation continues to discharge arsenic-contaminated water into Tributary One [and] [t]herefore, arsenic contamination in Tributary One is a direct consequence of historical and ongoing waste disposal practices."  (Docket No. 84, Ex. 12 at 13.)  "Arsenic is stable in the environment which allows it to accumulate in sediments. It is also in a readily bio-available form for uptake into aquatic species and plant life." (*Id.* at 14.)

FMC had conducted further downstream sampling, the results of which were not then available, and Dr. Iyer stated he would supplement his report based on those results. (*Id.* at 13-14.)  He did so on March 31, 2007, stating that FMC's report for Spring 2006 soil and sediment sampling along Tributary One, Jeddo Creek, and Johnson Creek to Marshal

15

and Townline Roads (approximately 10 miles from FMC) shows arsenic migration well beyond the geographic limit of historical sampling through 2004, and downstream arsenic levels appear to be higher than historical upstream levels.   "Given the long history of release, it is likely that arsenic migration may extend further beyond Townline Road." Further *soil sampling and stream modeling is recommended "to delineate elevated arsenic that is attributable to the FMC facility operations* and to identify creek segments for remediation."  (*Id*. Ex. 15.)

### iii.   *Plaintiffs' Residential Properties*

Dr. Iyer states "I have reviewed the data collected [by FMC] from the Plaintiffs' residences, and furthermore, I collected grab samples of surficial soils at 44 So. Vernon Street, the former Gagliardi residence.  Arsenic concentrations [at 44 So. Vernon] ranged as high as 85 ppm."  (*Id*.  Ex. 12 at 15 (reporting 85 ppm); Ex. 11 at 1 (reporting 84.5 mg/k).)   "I have reviewed FMC's studies to determine an appropriate 'background' concentration of arsenic for the Middleport residential soils.  In my opinion, the appropriate background value for arsenic is approximately 10 ppm.  It is my opinion . . . that residential soils contaminated by arsenic concentrations exceeding 10 ppm within the Village of Middleport require remediation."  (*Id.* Ex. 12 at 16.)

### iv.   *The Bioavailability of Arsenic*

Dr. Iyer further opines that the February 2004 "Evaluation of Arsenic Bioavailability" study prepared for FMC "may significantly understate the bioavailability of the arsenic that the large majority of Middleport residents (including school children) actually experience, and therefore result in a cleanup standard that is not stringent enough." (*Id*. at 18-19.) The

opinion is based on his beliefs that: (1) "[a] significantly higher percentage of arsenic could be bioavailable at lower total arsenic concentrations" than were present in the study samples, (2) "lower concentrations of arsenic found on surface soils several hundred feet or more away from the FMC plant are attributable to air deposition," and (3) "[f]requently, higher concentrations of arsenic are found in soils at depth, where arsenic has been relatively immobile or at least less mobile."  (*Id.*)  Dr. Iyer goes on to state that "arsenic is only one of the contaminants of concern" and again refers to *the need for a risk assessment.*  (*Id.* at 19.)

### v. *Soil Screening Levels*

Dr. Iyer also disagrees with a February 2003 "Technical Memorandum: Derivation of Health-Based ICM Screening Levels for Soil Arsenic, Middleport, NY," prepared for FMC, which he states recommends a 350 ppm cleanup standard[8] for arsenic in residential neighborhoods, including School District property.  He contends that value is "flawed and excessively non-conservative" because: (1) no consideration is given to other contaminants, (2) the selection of a $1\times10^{-4}$ cancer risk should be unacceptable and the highest value the EPA and DOH should even consider is $1\times10^{-5}$ because, more often than not, the Agencies require a $1\times10^{-6}$ value, (3) the standard assumes a bioavailability factor of 0.20, but the February 2004 bioavailability study reports a bioavailability factor of 0.25, (4) even a 0.25 bioavailability factor may be erroneous, and (5) arsenic background concentrations in residential areas should be around 10 ppm.  (*Id.* at 19-21.)  Because of

---

[8]  The report to which Dr. Iyer refers does not provide cleanup standards.  Rather, the health risk-based screening level he cites was intended to assist in the identification of areas for which an ICM may be appropriate.  (Docket No. 84, Ex. 8 at 39-40.)

this, he urges that "FMC needs to give highest consideration to *completing the investigation of School District property and performing a risk assessment* meeting generally accepted scientific standards for a highly vulnerable student population." (*Id*. at 21.)

vi.   <em>Imminent and Substantial Endangerment</em>

Based on the forgoing, Dr. Iyer opines "that the presence of the wastes and contaminants I have described in residential soils, groundwater, surface waters and nearby surficial soils is a result of FMC's 'disposal' within the meaning of [RCRA]. It is my opinion that the groundwater, surface water, residential soil, stream sediment and flood plain soil contamination presents an imminent and substantial endangerment to human health and the environment." (*Id*. at 16.)

vii.   <em>Discussion</em>

Dr. Iyer does not state the basis or reason for, or refer to any specific data or facts considered in, arriving at his conclusions that remediated portions of the Roy-Hart school property have likely been recontaminated and that the appropriate background level for arsenic is 10 ppm,[9] or his disagreement with the Evaluation of Arsenic Bioavailability Study. Accordingly, these portions of his report do not satisfy FED. R. CIV. P. 26(a)(2)(B) and must be disregarded.

At three separate points in his imminent and substantial endangerment discussion, Dr. Iyer notes that a risk assessment is required to assess arsenic exposure and possible human health risks, and to evaluate and select appropriate remedies. Similarly, he states

---

[9] For comparison, see the expert report of Teresa S. Bowers, Ph.D. and the data and methodologies presented therein. (Docket No. 84, Ex. 9.)

that further soil sampling and stream modeling is necessary to identify waterway contamination attributable to FMC and areas that may be in need of remediation.  FMC urges, and this  Court agrees, that Dr. Iyer's opinions and testimony relative to imminent and substantial endangerment cannot possibly be viewed as reliable under FED. R. EVID. 702.  Because he concedes both that further investigation is required to identify the source(s) and extent of contamination, and that he did not undertake the risk-based calculation essential to an assessment of risks and remedies, no reliable scientific methodology or basis exists for his opinion that releases from FMC pose an imminent and substantial endangerment to human health and the environment.[10]

       b.      <u>Closure and Post-Closure Plans</u>

According to Dr. Iyer, he has been "advised" that FMC does not have closure and post-closure plans that conform to governing regulations and has not arranged for requisite financial assurances.  He goes on to state that: "In my opinion, the FMC facility should be treated in its entirety as a [single] disposal unit requiring a comprehensive closure and post-closure plan."  (*Id*. at 25.)

Dr. Iyer does not state the basis or reason for, or refer to any data or facts considered in support of this opinion.  Accordingly, these conclusory statements do not satisfy FED. R. CIV. P. 26(a)(2)(B).

       c.      <u>SPDES Permit Exceedances</u>

Dr. Iyer states that he has reviewed FMC's [water treatment plant effluent]

---

[10]  FMC and its experts identified a number of fact and calculation errors in this portion of Dr. Iyer's report, many of which he acknowledged in his deposition.  However, because the failure to engage in a risk assessment renders his conclusion unreliable in and of itself, those errors need not be examined in detail.

monitoring reports dating from 1977 through 2006 which "show numerous exceedances of the discharge limits in FMC's SPDES permit, including but not limited to arsenic, carbofuran and phenol." (Docket No. 84, Ex. 12 at 14, 26.)   "It is my opinion that the exceedances in the direct controlled discharges are a direct result of the failure of the treatment plant to maintain its removal efficiencies.   In my opinion, FMC's surface water treatment plant should be able to achieve zero exceedance of the SPDES discharge limits [by] . . . such measures . . . [as] improvements to the treatment process, treatment plant upgrade, and even storage and recycling of treated water back through the treatment plant . . . .   FMC should have taken one or more of these measures." (*Id*. at 27.)

On March 31, 2007, Dr. Iyer supplemented this portion of his January 31 report by providing tables of discharge exceedances, which he states were compiled from FMC's daily and weekly reports.   (*Id*. Ex. 13.)

FMC argues that Dr. Iyer's conclusions are entirely unreliable because the supporting documentation he presents is demonstrably wrong.   Specifically, one of Dr. Iyer's tables reverses the discharge limits for arsenic applicable to direct and controlled discharges and another includes only one of the applicable limits.   Dr. Iyer also misstates a discharge limit for ammonia.   Because of these and other errors, Dr. Iyer identifies seven times more arsenic exceedances than would show had the data been presented correctly (44 versus 6).   (*Id*. Ex. 5 at 13-16.)   FMC urges that, because of these errors, the tables offered by Dr. Iyer in support of his statements do not meet the reliability requirements of Fed. R. Evid. 702.   This Court agrees these errors indicate that Dr. Iyer has not applied principles and methods reliably to the facts of this case, and his statements regarding

20

SPDES exceedances do not satisfy FED. R. EVID. 702.[11]

        d.     RCRA Open Dumps

Dr. Iyer states that FMC owns and/or operates and/or disposed of solid waste, directly or indirectly, on Area 2 and the Northern Ditches. (*Id*. Ex. 12 at 27.) He refers to the June 2003 "Draft 2002 Sampling Program Report, FMC Corporation, Middleport, New York" as evidence that certain metals and chemicals have been detected in these areas in concentrations exceeding soil screening levels. (*Id*. at 27-28.) He does not draw any conclusions or offer any opinions in this regard.

        e.     Cleanup Duration

Dr. Iyer's final March 31, 2007 supplementation addresses the average cleanup duration for Superfund sites. He notes that, in 1999, EPA reported that it took an average of 8 years for sites added to the National Priorities List in the 1990s to construct a remedy. He then presents, in table form, a chronology of FMC remediation-related activities from June 1975 through October 2006. (*Id*. Ex. 14.)

FMC contends that to the extent Dr. Iyer intends to testify its cleanup process under Agency supervision is not progressing quickly enough, his memorandum is unreliable because he relies on data relating to an inapplicable statute. The report Dr. Iyer references discusses remediation and removal programs at CERCLA[12] sites. However, FMC's cleanup is governed by RCRA Corrective Action requirements, not CERCLA. Moreover,

---

[11] FMC concedes that six of the identified exceedances, plus another, did occur. (Docket No. 84, Ex. 5 at 16.)

[12] The Comprehensive Environmental Resoponse, Compensation, and Liability Act, commonly known as Superfund.

the referenced report presents average cleanup durations for single operable units only, whereas there are 16 operable units in the FMC program.  Because Dr. Iyer's anticipated testimony is not based on data from RCRA remediation projects, it is both speculative and unreliable and does not satisfy FED. R. EVID. 702.

    f. <u>Dr. Iyer's Opposing Declaration</u>

   In opposition to FMC's arguments, Plaintiffs have filed Dr. Iyer's declaration, which appears intended to serve as both rebuttal and supplementation.

   In the first instance, Dr. Iyer seeks to rebut FMC's expert's opinion regarding claimed deficiencies in his So. Vernon soil sampling methodology, and raises issues as to the adequacy of FMC's soil sampling.  (Docket Nos. 134 ¶¶ 144-153; 84 Ex. 11.)  His declaration is unavailing for this purpose because, assuming the sampling results on that single parcel of residential property are reliable, that alone is not sufficient to overcome the cumulative deficiencies in Dr. Iyer's work product, including, *inter alia*,  failure to provide a complete statement of the basis and reasons for the opinions expressed, failure to state facts and data considered, and errors that render the opinions unreliable or irrelevant. More significantly, the So. Vernon sampling results are offered in support of the conclusion that imminent and substantial endangerment exists—a conclusion that the Court has determined is inadmissible due to Dr. Iyer's acknowledgment that he did not conduct or consider investigations essential to that issue.

   In an apparent effort to further supplement his report, Dr. Iyer attests to "additional" SPDES permit violations that are purportedly supported by his prior disclosure; several "new" violations not previously disclosed, only one of which occurred after his March 31, 2007 supplemental report; and offers various facts and opinions relative to FMC's 2006

plan for upgrading its water treatment plant, a topic not discussed in his January 2007 expert report or any supplementation thereto.  (Docket Nos. 134 ¶¶ 110-137; 84 Ex. 13.)  Next, Dr. Iyer seeks to introduce documents prepared in the 1980s as evidence supporting his statements regarding closure and post-closure plans.  (Docket 134, ¶¶ 138-143.)  Finally, Dr. Iyer discusses, for the first time, purported radiological contamination in site groundwater based on documents from the years 1964 to 1987.  (Docket Nos. 134 ¶¶ 154-180.)

"It should be assumed that at the time an expert issues his report, that report reflects his full knowledge and complete opinions on the issues for which his opinion has been sought."  Sandata Tech., Inc. v. Infocrossing, Inc., Nos. 05 Civ. 09546, 06 Civ. 01896, 2007 U.S. Dist. LEXIS 85176, at *11 (S.D.N.Y. Nov. 16, 2007).  To the extent Dr. Iyer's declaration presents "additional" and "new" evidence and opinions, and evidence in support of prior opinions where no basis, facts, or data were provided previously, the declaration cannot be construed as a supplemental report under FED. R. CIV. P. 26(e).[13]

The duty to supplement arises when the expert subsequently learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate.  FED. R. CIV. P. 26(e).  Dr. Iyer does not attest that the historical documents and data appended to his declaration were unknown or unavailable to him when he prepared his initial report and subsequent supplementations.  "[Rule] 26(e) does not grant a license to supplement a previously filed expert report because a party

---

[13]  FMC argues that the evidence and conclusions in Dr. Iyer's declaration suffer from the same deficiencies as his earlier reports and so is inadmissible under Daubert.  The more fundamental question, in this Court's view, is whether it should be considered a supplemental report at all.

23

wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect." Coles v. Perry, 217 F.R.D. 1, 3 (D.D.C. 2003).  "To construe supplementation to apply whenever a party wants to bolster . . . [its] expert opinions would [wreak] havoc [on] docket control and amount to unlimited expert opinion preparation."  Akeva LLC v. Mizuno Corp., 212 F.R.D. 306, 31 (M.D.N.C. 2002) (cited in Oceans Cuisine, Ltd. v. Fishery Prods. Int'l, Inc., No. 05-CV-3613, 2006 U.S. Dist. LEXIS 22133, at *14-15 (E.D.N.Y. Apr. 21, 2006)); see also, St. Gobain Corp. v. Gemtron Corp., No. 04-CV-387, 2006 U.S. Dist. LEXIS 28263, at *5 (W.D. Mich. May 9, 2006).  In short, Rule 26(e) is not a license to amend or rework an expert report to avoid summary judgment.  Sharpe v. United States, 230 F.R.D., 452, 462-63 (E.D. Va. 2005).

        In sum, Dr. Iyer's opinions are conclusory and lack appropriate support.  His report is not salvaged by his three supplemental memoranda, one of which presents inaccurate data and another of which is based on an inapplicable statute, and it cannot be further amended via his declaration.  Accordingly, FMC's motion to preclude is granted, and Dr. Iyer's report, memoranda, declaration, and testimony will not be considered in connection with the summary judgment motion.[14]  It is well-settled that Daubert and its progeny require the Court to reject opinion evidence bottomed upon speculation and guesswork.  Barban v. Rheem Testiles Sys., Inc., No. 01-CV-8475, 2005 U.S. 5996, at *19 (E.D.N.Y. Feb. 11, 2005).

---

[14]  The Court wants to emphasize, at this juncture, that it has found Dr. Iyer to be qualified in certain areas of expertise based on his education and years of experience.  In this instance, however, Dr. Iyer, who has not previously served as an expert witness, has failed to provide adequate support for his opinions.  Therefore, his report in this case does not meet the relevant standards.

**B.      The Summary Judgment Motion**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A fact is "material" if it "might affect the outcome of the suit under the governing law."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id.*

In deciding a motion for summary judgment, the evidence and the inferences drawn

from the evidence must be "viewed in the light most favorable to the party opposing the

motion."  Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L.

Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of

evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.

1991).  The function of the court is not "to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S.

at 249.  "Assessments of credibility and choices between conflicting versions of the events

are matters for the jury, not for the court on summary judgment."  Rule v. Brine, Inc., 85

F.3d 1002, 1011 (2d Cir. 1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat

summary judgment.  Anderson, 477 U.S. at 252.  A nonmoving party must do more than

cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence

showing that its version of the events is not wholly fanciful."  Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

By rule, judgment may be entered against a party who fails to respond to a properly supported summary judgment motion by setting forth specific facts in acceptable form showing a genuine issue for trial. Fed. R. Civ. P. 56 (e)(2). But failure to oppose or respond to all or part of a summary judgment motion, standing alone, does not warrant granting the motion: "the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244, 246 (2d Cir. 2004) ("failure to respond to [a Rule 56] motion does not alone discharge the burdens imposed on a moving party"); Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001). If the moving party fails to submit evidence sufficient to meet its burden, "summary judgment must be denied even if no opposing evidentiary matter is presented." Amaker, 274 F.3d at 681. Consequently, the Second Circuit has emphasized that district courts "'in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'" Vt. Teddy Bear, 373 F.3d at 246 (quoting Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993)).

### 1.     *The First Claim—Imminent and Substantial Endangerment*

Plaintiffs' first claim is brought under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), which provides that "any person may commence a civil action on his own behalf . . . against any person . . . who has contributed or who is contributing to the past

or present handling, storage, treatment, transportation, or disposal of any solid or

hazardous waste which *may present an imminent and substantial endangerment to health*

*or the environment.*" 42 U.S.C. § 6972(a)(1)(B) (emphasis added).

>   A RCRA plaintiff must ultimately demonstrate that:
>
>   (1) the defendant was or is a generator or transporter of solid or hazardous
>   waste or owner or operator of a solid or hazardous waste treatment, storage
>   or disposal facility, (2) the defendant has contributed or is contributing to the
>   handling, storage, treatment, transportation, or disposal of solid or hazardous
>   waste, as defined by RCRA, and (3) that the solid or hazardous waste in
>   question may pose an imminent and substantial endangerment to health or
>   the environment.

Major, 2006 U.S. Dist. LEXIS 65225, at *42 (quoting Prisco v. A & D Carting Corp., 168

F.3d 593, 608 (2d Cir. 1999)).  Only the third factor is at issue here.

### a.   The Imminent and Substantial Endangerment Standard

The Second Circuit has given a broad construction to the standard for "imminent

and substantial endangerment":

>   Significantly, congress used the word "may" to preface the standard of
>   liability: "present an imminent and substantial endangerment to the health or
>   the environment[.]" This is expansive language, which is intended to confer
>   upon the courts the authority to grant affirmative equitable relief to the extent
>   necessary to eliminate *any risk* posed by toxic wastes.

Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 210 (2d Cir. 2009) (quoting Dague v.

City of Burlington, 935 F.2d 1343, 1355 (2d Cir. 1991) (internal quotation marks and

citations omitted)).   No matter how broadly read, however, the statute still requires a

showing that the contamination at issue may present an "endangerment" that is both

"imminent" and "substantial."   The courts have further evaluated each term.

Under Dague, "'imminency' does not require a showing that actual harm will occur

immediately so long as the risk of threatened harm is present."  935 F.2d at 1356.  The

term "implies that there must be a threat which is present *now*, although the impact of the threat may not be felt until later." Meghrig v. KFC W., Inc., 516 U.S. 479, 485-86 (1996) (citation omitted).

The Second Circuit, along with at least five others, has concluded that an endangerment is "substantial" if it is serious. Cordiano, 575 F.3d at 210-11 (collecting cases). An endangerment is "substantial" where there is reasonable cause for concern that someone or something may be exposed to risk of harm if prompt remedial action is not taken. Aiello v. Town of Brookhaven, 136 F. Supp.2d 81, 115 (E.D.N.Y. 2001) (citation omitted); *see also*, Raymond K. Hoxsie Real Estate Trust v. Exxon Educ. Fdn., 81 F. Supp. 2d 359, 366 (D.R.I. 2000) (same).

An "'endangerment" is a "threatened or potential harm and does not require proof of actual harm.'" Cordiano, 575 F.3d at 211 (quoting Dague, 935 F.2d at 1356).

Courts have jurisdiction to "restrain" waste handling or disposal that may present endangerment, or order any action that may be "necessary" to eliminate such danger. 87th St. Owners Corp. v. Carnegie Hill-87th St. Corp., 251 F. Supp.2d 1215, 1219 (S.D.N.Y. 2002).

b.    Discussion

FMC offers three arguments for dismissal of Plaintiffs' first claim for relief: (1) to avoid summary judgment, Plaintiffs must prove that an imminent and substantial endangerment *does* exist;   (2) FMC's ongoing remediation efforts under agency supervision render injunctive relief unnecessary; and (3) in light of FMC's uncontroverted evidence, Plaintiffs have not and cannot raise a material question of fact.

The first argument is readily disposed of based on the foregoing discussion of the

28

standard applied to § 6972(a)(1)(B) claims.  In essence, FMC argues that, even assuming there are facts sufficient to state a claim that an imminent and substantial endangerment *may* exist, such a showing is not enough to avoid summary judgment because, at this juncture, Plaintiffs must demonstrate that an imminent and substantial endangerment *does* exist.

FMC cites two cases in support, neither of which stands for the stated proposition. Indeed, both decisions adhere to the broad construction the Second Circuit has given to RCRA claims and expressly recognize that RCRA plaintiffs need *not* prove that harm already has occurred or that actual harm will occur immediately; RCRA authorizes injunctive relief to eliminate *any risk* posed by toxic wastes.  Kara Holding Corp. v. Getty Petroleum Mktg., Inc., No. 99 Civ. 0275, 2004 U.S. Dist. LEXIS 15864, at *27-28 (S.D.N.Y. Aug. 12, 2004); 87th St., 251 F. Supp.2d at 1217-18 (citing interpretation of RCRA set forth in Dague, 935 F.2d at 1355-56).  And, of course, the Second Circuit has more recently concluded that "'the combination of the word 'may' with the word 'endanger,' both of which are probabilistic, leads us to conclude that a reasonable prospect of future harm is adequate to engage the gears of [§6972(a)(1)(B)] so long as the threat is near-term and involves potentially serious harm.'" Cordiano, 575 F.3d at 211 (quoting Maine People's Alliance v. Mallinckrodt, Inc., 471 F.3d 277, 296 (1st Cir. 2006)).  Accordingly, FMC's first argument is rejected.

That logically leads to FMC's third argument, that summary judgment is warranted because FMC has presented uncontroverted expert testimony that no "imminent and substantial endangerment" exists, and Plaintiffs cannot successfully raise a genuine issue

of material fact in that regard.  This Court agrees that Plaintiffs have not raised, and on this record cannot raise, a material question of fact.

In opposition to FMC's motion, Plaintiffs offer three letters they claim raise a material question of imminent and substantial endangerment.  The first two from the Agencies, are dated November 3 and 5, 2009, respectively, and relate to FMC's recently completed "environmental investigation into the levels of arsenic in soil on Middleport area properties located within Air Deposition Area 1 and along Culvert 105."  (Docket Nos. 162-4; 162-5.)

The first Agency letter is addressed to the Roy-Hart School District.  It notes that Roy-Hart's Middleport property falls in the study area, some soil samples taken in non-remediated areas of the school property exceed the 20 ppm upper limit background level for arsenic estimated by the Agencies, and, for that reason, the school property has been included in the FMC CMS in order to evaluate what, if any, properties/areas will require corrective measures and what types of measures may be necessary.  (Docket No. 162-4 at 1-2.)  An attached table shows arsenic levels in the top 6 inches of sampled soil that, in some instances, exceed 50 ppm.  (*Id.* at 7.)

The second letter is addressed to Plaintiffs Victor and Judith Baker, whose residential property also is located in the study area.  There, too, it is noted that some or all soil samples exceed 20 ppm for arsenic and that their property has been included in the FMC CMS.  The Agencies further noted that "elevated levels of arsenic present the potential for exposure."  (Docket No. 162-5 at 1-2.)  An included "Arsenic Fact Sheet" states, among other things, that EPA and other entities "classify inorganic arsenic as a human carcinogen."  (*Id.* at 6.)  The reported arsenic results for the first 6 inches of soil at the Baker property are all less than 50 ppm.

30

The final letter is from DEC to FMC and relates to that agency's annual compliance inspection in connection with the Facility's SPDES permit. DEC states that "[o]verflows from the Western Surface Impoundment (WSI) continue to be a concern . . . [and] likely contribute to a significant loading of arsenic to the receiving water." (Docket No. 162-2 at 1-2.)

Together, these letters and attachments indicate that arsenic is classified as a hazardous substance, there are unremediated soils in Middleport with arsenic levels that exceed 20 ppm,[15] those elevated levels are at least partly attributable to FMC's activities, and the elevated levels may present some potential for exposure.

Plaintiffs contend that, although FMC has ceased production, formulation, and packaging of arsenic-containing products, soil arsenic levels in Middleport that "are in excess of a plethora of cleanup standards and guidance values in use in upstate New York specifically and around the country in general . . . compels the conclusion that an imminent and substantial endangerment . . . exists." (Docket No. 141 at 16-17.) Plaintiffs cite to several cases for the proposition that proof of contamination in excess of state cleanup standards is sufficient, by itself, to defeat summary judgment. (Docket Nos. 141 at 13; 163 at 5 n.5.) Only one case, Nashua Corp. v. Norton Co., is from within this circuit. 116 F. Supp. 2d 330, 356 (N.D.N.Y. 2000). This post-trial decision is distinguishable on two important points. First, the judge was not persuaded by the continued presence of contamination alone. She was persuaded, at trial, by the testimony of the plaintiff's experts on the issue of endangerment. Here, Plaintiffs' expert has been precluded. Second, the

---

[15] The 20 ppm background level for Middleport soils is higher than New York State's unrestricted use soil cleanup objective of 13 ppm. 6 NYCRR § 375-6.8(a).

supervising government agent concurred with the plaintiff's experts and testified that the contaminants may present an imminent and substantial threat to health or the environment. Here, to the extent the Agencies have addressed the unremediated parcels while FMC's CMS is ongoing, they have opined that at the known arsenic levels (which in some areas exceed 50 ppm), property is suitable for recreational and non-recreational uses by children.

In their supplemental memorandum, Plaintiffs rely on Interfaith Cmty. Org. v. Honeywell Int'l, Inc., a case from the Third Circuit which states that contamination in excess of state standards may, by itself, support a finding of liability in some cases. 399 F.3d 248, 261 (3d Dir. 2005). Even assuming some such circumstances exist, the Second Circuit has held, in a case quite similar to this one, that such a fact is "plainly insufficient" to allow a reasonable factfinder to assess the magnitude of a possible risk, the imminency of the potential harm, or whether the potential harm is serious. Cordiano, 575 F.3d at 212-214. As was the case in Cordiano, the state standards Plaintiffs' rely on—DEC's TAGM 4046 and/or 6 NYCRR § 375-6.8(a)—do not define a party's federal liability under RCRA, nor do they mandate remediation when soil levels are found to exceed the cleanup standards. 575 F.3d 212-13. Without any evidence linking the cited standards to potential imminent and substantial risks to human health or wildlife, reliance on the standards alone presents merely a speculative prospect of future harm, the seriousness of which is equally hypothetical. In short, Plaintiffs cannot, on this record, support the necessity for a remedy.

Had Dr. Iyer not been precluded, his testimony would not salvage Plaintiffs' claim. Dr. Iyer repeatedly stated that a risk assessment, which he did not perform, is necessary to determinations of the level of contamination attributable to FMC, the potential for risk of harm, and appropriate remedies. So, even with Dr. Iyer's testimony, the evidence would

32

remain insufficient to support a finding that a reasonable prospect of future serious harm exists.[16]   Cordiano, 575 F.3d at 212.   Accordingly, summary judgment is granted on Plaintiffs' first claim for relief.[17]

> ### 2.   *The Second Claim—On-Site Open Dumping*

This claim relates to the three surface impoundment areas which are or were SWMUs covered by the corrective action program being performed pursuant to the AOC. (Docket No. 90 ¶ 15.)  In their Complaint, Plaintiffs claim that FMC is engaged in waste management activity at the three impoundment areas, the activities are regulated by DEC, "upon information and belief" FMC has violated DEC regulations by failing to prepare closure and post-closure plans and failing to provide requisite financial assurances,[18] and the purported violations constitute "open dumping" prohibited by RCRA.

FMC argues that, as a matter of law, Plaintiffs' allegations are insufficient to maintain a citizen suit claim under 42 U.S.C. § 6972(a)(1)(A).  Plaintiffs have not offered any evidence in support of this claim, nor have they addressed the claim in their opposing or supplemental memoranda.

Section 6945 of the RCRA provides that:

---

[16]  It bears noting again that the Agencies have not identified a risk of harm in unremediated areas, and have stated, with regard to the school property, that "based on all available information and environmental data, we see nothing that raises an immediate health concern."  (GE007694.)  The known arsenic levels at unremediated portions of the school property, which equal or exceed those found on the Baker property, logically extend the Agencies' determination to that residential property, as well. Moreover, FMC's toxicology expert, whose report is unchallenged, concluded that "arsenic in Middleport soil is not contributing any measurable arsenic exposure for residents."  (Docket No. 84, Ex. 8 at 1.)

[17]  Because of this conclusion, the Court need not consider FMC's argument that the fact of government oversight obviates any need for injunctive relief.

[18]  Although FMC does not address the alleged DEC violations, it already has been noted that FMC provided DEC a closure plan in 1986 and has provided the requisite financial assurances with regard to these areas, *infra* 5-6.

> Any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section. The prohibition contained in the preceding sentence shall be enforceable under section 6972 of this title [the citizen suit provision] against persons engaged in the act of open dumping.

42 U.S.C. § 6945(a).

The Second Circuit has concluded "that 'what is prohibited by the statute and the [associated] regulation [40 C.F.R. § 257.3-4] (read together) is the act of introducing a substance that causes . . . exceedances . . . .'" June v. Town of Westfield, 370 F.3d 255, 259 (2d Cir. 2004) (quoting South Rd. Assocs. v. IBM, 216 F.3d 251, 256 (2d Cir. 2000)). Thus, a "historical act cannot support a claim for violation of 42 U.S.C. § 6945(a)" that is based on the "introduction" of a contaminant.   South Rd. Assocs. 216 F.3d at 257. Plaintiffs' bald allegation of waste management activities is insufficient to support a claim for relief.  June, 370 F.3d at 259 (dismissing RCRA open dumping claim where plaintiff did not allege that, at the time suit was filed, defendants continued to introduce substances into environment that made exceedances worse).

Turning to the record, it is undisputed that the western and central surface impoundments were closed in 1988 and 1999, respectively.  The eastern impoundment area is used for the temporary management of contaminated soils generated from off-Facility ICMs.  However, South Rd. Assocs. expressly held that "the movement of soil (with or without contaminants) from here to there pursuant to a state-sponsored or state-authorized plan or program does not constitute 'introduction' for the purposes of RCRA." 216 F.3d at 257.

Accordingly, neither the pleading nor the record in this case support the claimed

violation and summary judgment is warranted as to this second claim for relief.

### 3.    *The Third Claim—Off-Site Open Dumping*

Plaintiffs' third claim also alleges "open dumping" in violation of 42 U.S.C. § 6945(a), this time in connection with the Northern Ditches and Area 2.  This claim is predicated on Plaintiffs' belief that FMC is violating the surface water criterion promulgated by the EPA in 40 C.F.R. § 257.3-3(a) because stormwater discharges from these areas are occurring absent a National Pollutant Discharge Elimination System (NPDES) or SPDES permit.[19]

> *For purposes of Section 4004(a)* of [RCRA], a facility shall not cause a discharge of pollutants into waters of the United States that is in violation of the requirements of the National Pollutant Discharge Elimination System (NPDES) under Section 402 of the Clean Water Act , as amended."

40 C.F.R. § 257.3-3(a) (emphasis added).

FMC urges that Plaintiffs cannot, as a matter of law, bring a citizen suit for the alleged disposal of solid waste in surface water in violation of this regulation.  Again, Plaintiffs have not addressed FMC's argument in their opposing or supplemental memoranda.

In Long Island Soundkeeper Fund, Inc. v. New York Athletic Fund, on which FMC relies, the Southern District of New York engaged in statutory construction on precisely this question.  No. 94 Civ. 0436, 1996 U.S. Dist. LEXIS 3383, at *26-32 (S.D.N.Y. Mar. 20, 1996).  Based upon its comprehensive analysis of several of RCRA's provisions, EPA's

---

[19]  As previously noted, FMC does have a SPDES permit.  However, that permit relates to discharges from its water treatment plant to outfall 001.

related regulations, and EPA commentary, the district court found it "clear that the EPA did not intend for the surface water criteria promulgated under section 4004(a) of RCRA (42 U.S.C. 6944(a)) to authorize citizen suits for open dumping practices in violation of section 4005(a) of RCRA (42 U.S.C. § 6945(a))." *Id*. at 32; *see also*, Arc Ecology v. United States Maritime Admin., No. 07-cv-2320, 2010 U.S. Dist. LEXIS 4481, at *8 (E.D. Cal. Jan. 20, 2010) (the discharge of pollutants in violation of the CWA can be addressed under CWA, and the EPA limited enforcement of 40 C.F.R. § 257.3-3(a)'s surface water criterion to States); Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp., 450 F. Supp. 2d 467, 486-87 (D.N.J. 2006) (Section 4004(a) of RCRA exists only to guide State governments in development of solid waste management programs and does not authorize citizen suits).

Plaintiffs have not offered, nor has this Court found, any contrary authority. Because it is clear that Plaintiffs cannot maintain this "open dumping" claim as a matter of law, FMC's motion is granted as to the third claim.

### 4.    *The Fourth and Fifth Claims—Unlawful Stormwater Discharges*

Plaintiffs' fourth and fifth claims allege that FMC unlawfully discharges stormwater from the Northern Ditches and Area 2 in violation of the Clean Water Act (CWA), 33 U.S.C. §§ 1311 and 1342 (fourth claim), and that its discharges from the North Ditch to a municipal storm sewer without a SPDES or NPDES permit further violates the same statutory provisions (fifth claim).

FMC contends that Plaintiffs lack the requisite constitutional standing to maintain these claims and, alternatively, argues for judgment on the merits. Plaintiffs urge that their supplemental evidence raises genuine issues of material fact with regard to both standing

and the merits.

The CWA regulates and monitors the discharge of pollutants into the waterways of the United States. 33 U.S.C. §§ 1251-1287. Section 1311 of Title 33 makes the discharge of any pollutant by any person unlawful, unless it is done in compliance with a specified CWA provision, one of which is 33.U.S.C. § 1342. Section 1342 empowers EPA or an authorized state agency—here, the DEC—to issue national or state pollutant discharge elimination system permits, referred to respectively as NPDES and SPDES. The CWA authorizes government enforcement, as well as suits by private citizens, for permit-related violations. 33 U.S.C. §§ 1319, 1365.

Where citizen suits are authorized by statute, a plaintiff still must satisfy the case-or-controversy requirement of the Constitution, a controlling element of which is standing. *See* U.S. CONST. art. III, §2. Constitutional standing requires a plaintiff to show (1) an "injury in fact" which is (2) "fairly traceable" to the defendant's conduct and (3) likely to be redressed by the requested relief. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-181 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)); *see also*, Hein v. Freedom from Religion Found., Inc., 551 U.S. 587, 598, 127 S. Ct. 2553, 168 L. Ed. 2d 424 (2007) (confirming well-established requisite elements of Article III standing). The plaintiff bears the burden of establishing each standing element. Lujan, 504 U.S. at 561.

FMC contends that Plaintiffs lack standing because they have failed to allege or prove a distinct and palpable injury. An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal citations, footnote and quotation marks

37

omitted).   "At the summary judgment stage, as in this case, a . . . plaintiff has the burden

to establish . . . , by affidavit or other evidence, a factual showing of perceptible harm."

New Creation Fellowship of Buffalo v. Town of Cheektowaga, No. 99-CV-460, 2004 U.S.

Dist. LEXIS 25431, at *44 (W.D.N.Y. July 2, 2004) (internal citation and quotation marks

omitted).

Here, each Plaintiff alleges he or she "has been and continues to be adversely

affected by the pollutants consistently and actively being deposited on [his or her] property

and inhaled or otherwise ingested into [his or her] person by the actions and omissions of

the Defendant."  (Docket No. 1 ¶¶ 11-23.)  Some or all of the Plaintiffs claim to "have

sustained injuries to their person" and/or to their properties, "the value of which has been

diminished," as a result of FMC's acts or omissions.  (Id. ¶¶ 11-23, 186-88.)

But at this juncture, something more than allegations is required.  With regard to

their health, Plaintiffs have not offered any proof of injury that is imminent or actual.  As

previously noted, Plaintiffs have not raised a question of fact as to the reasonable

possibility of imminent harm, and cannot do so absent a risk assessment.  Likewise,

Plaintiffs have not offered affidavits or evidence of actual harm.

Nevertheless, FMC has proffered Plaintiffs' medical records (Docket No. 84, Ex. 1)

and, for purposes of this standing argument only, the Court will assume that at least some

of the various medical complaints, ailments, and conditions in those records constitute an

injury.

Even assuming some injury exists, Plaintiffs have not offered an iota of evidence

to support a causal connection between chemical exposure and any medical complaint,

much less exposure linked to FMC's stormwater discharges.  Plaintiffs' only expert has

38

been precluded, but his testimony, if allowed, could not support causation. Indeed, Dr. Iyer conceded that he is not a medical doctor or toxicologist and, further, that he made no effort to assess Plaintiffs' claims of personal injury due to chemical exposure. (*Id*. Ex. 16 at 19.) Plaintiffs' medical records do not contain any written opinion that any medical condition was caused by exposure to arsenic or any other toxin, and the Plaintiffs who are alleging personal injury each concede that no doctor has ever advised them any illness or condition was caused by exposure to a toxin. (Docket No. 84 ¶ 5, Exs. 1 and 2.)

Beyond medical causation, Plaintiffs need to show some causal link to the conduct complained of, specifically that FMC's stormwater discharges have impacted their health. FMC contends they cannot do so, at least with regard to the Northern Ditches, because that area has been fully remediated.[20] In response, Plaintiffs urge, and the record supports the fact, that stormwater previously discharged from the North Ditch now is directed to the WSI and discharged through a sewer outfall. Plaintiffs then point to a letter from the DEC to FMC which notes the occurrence of prohibited overflows from the WSI that bypass FMC's treatment plant, which bypasses may result in violations of its SPDES permit, and may impact the receiving waters. (Docket No. 162-2 at 1-2.)

However, Plaintiffs have not provided any evidence that discharges from the Northern Ditches, Area 2, or the WSI flowed through or onto their properties, thereby depositing pollutants. The record simply is devoid of facts suggesting that any alleged injury is traceable to toxins carried to Plaintiffs' properties in FMC's stormwater discharges. *See* New Manchester Resort & Golf, LLC v. Douglasville Dev., LLC, 734 F. Supp.2d 1326,

---

[20]  FMC's arguments in this regard do not relate to standing and so are irrelevant at this point.

1333-34 N.D. Ga. 2010) (expert testimony that defendants were source of recently released sediments that escaped downstream *and accumulated on plaintiff's property* sufficient to show traceability)  Patterson v. Barden & Robeson Corp., No. 04-CV-0803, 2007 U.S. Dist. LEXIS 11225, at (W.D.N.Y. Feb. 13, 2007) (plaintiffs sufficiently established injuries were fairly traceable to defendant's CWA violations where they provided evidence that *water flowed to their property* bringing sediments and pollutants); Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1003-1004 (11th Cir. 2004) ("Mrs. Parker demonstrated an injury-in-fact by showing that water runoff originating on the defendants' property caused hazardous substances, such as PCBs and lead, *to migrate onto the Parker property*" and injury was fairly traceable to defendants' failure to obtain or comply with their NPDES permit) (emphasis added)).

Plaintiffs contend that they have at least raised a question of fact in this regard and point to a letter from the Agencies to Plaintiffs Victor and Judith Baker, who reside at 79 So. Main Street.  (Docket No. 162-5.)  The letter states that their property was included in an investigation into soil arsenic levels at properties located within "Air Deposition Area 1 and along Culvert 105."  (*Id.* at 1.)

> Air Deposition Area 1 is the area of suspected historic FMC Plaint air deposition beyond the FMC property which is bounded by the Erie Canal to the north and the Niagara/Orleans County Line to the east.  Culvert 105 is the area of past FMC Plant releases to a storm water channel which includes properties along the culvert and ditch running from the railroad tracks north to its discharge point into the tributary near the Middleport Sewage Treatment Plant.

(*Id.* at 1 n.1.)  The letter, which may well be a form letter sent to all residents in the defined areas, goes on to state that elevated arsenic levels on the property may be "wholly or partly

40

attributable to past releases of chemicals from the FMC Plant due to deposition of past air emissions *and/or* migration from past site discharges/run-off to local storm water management systems (i.e., Culvert 105)." (*Id.* at 2 (emphasis supplied).) On this basis Plaintiffs urge that "there is clearly a question of fact concerning whether at least some of the Plaintiffs, and possibly all Plaintiffs . . . have been injured by FMC's ongoing failure to control its stormwater discharges." (Docket No. 163 at 11.)

This argument is unavailing. First, Plaintiffs' burden at this stage is to establish standing, and thereby the Court's jurisdiction to reach the merits. Simply raising a possibility is not enough, particularly where, as here, the relevant facts are readily ascertainable. The letter does not suffice to establish traceability because it does not confirm that any of the Plaintiffs' properties are located "along the culvert and ditch running from the railroad tracks north to its discharge point."[21] The plot map appended to the Baker letter does not show a culvert or ditch, or the location of their property relative to the Facility, the railroad tracks, or any other landmark. Plaintiffs have provided no affidavit, map, or other evidence that any of their properties are located north of the Facility along Culvert 105 such that chemicals may have migrated to their properties in stormwater discharges as well as from air depositions.

Plaintiffs also have not established standing relative to their claim of diminished property values due to FMC's stormwater discharges. First, they have provided no expert opinion or factual evidence that would establish, or even suggest, an injury-in-fact. The

---

[21] Similarly, it does not confirm that Plaintiffs' properties could have been impacted by stormwater from the Northern Ditches running from the railroad tracks to Culvert 105, or from Area 2 which is located to the north of the Northern Ditches.

only record evidence on this issue is real estate appraiser Bird's assessment of fair market value for each property based on comparable sales in Middleport and other communities in Niagara County, and his opinion that Plaintiffs' properties values are not adversely affected by their proximity to FMC.  (Docket Nos. 84, Exs. 6 and 7; 89 ¶ 9.)  And even were an "injury in fact" supported by the record, Plaintiffs have not established a causal link to stormwater discharges for the reasons stated above.

Because the Court lacks jurisdiction to consider Plaintiffs' fourth and fifth claims, summary judgment is warranted.

### 5.    *The Sixth Claim—SPDES Violations*

In their sixth claim, Plaintiffs allege that FMC has discharged and continues to discharge pollutants into Culvert 105 that exceed the effluent limitations established in its SPDES permit, and has failed to properly monitor, measure, and maintain reports in accordance with the permit, all in violation of the CWA.  This claim relates to water discharged from FMC's treatment plant, as distinguished from the stormwater discharges that are the subject of the fourth and fifth claims.

FMC, citing Gwaltney of Smithfield v. Chesapeake Bay Found, argues that Plaintiffs lack standing because they cannot predicate their claim on wholly past violations, and their claim of ongoing violations is untrue.  484 U.S. 49, 64-66, 108 S. Ct. 376, 98 L. Ed.2d 306 (1987).  Plaintiffs vehemently urge that FMC's SPDES permit violations are ongoing.  The Court need not resolve this factual dispute because, for the reasons discussed above, Plaintiffs have not established Article III standing.

Plaintiffs have not shown, and on this record cannot establish, an injury to their persons or property.  To the extent Plaintiffs seek to further allege some aesthetic

degradation to discharge waterways (Docket No. 1, ¶ 144), they have not shown by deposition testimony or otherwise that they have an interest in the allegedly impacted waterways or suffered any personalized harm (Docket No. 84, Exs. 2, 18).

Because the SPDES discharges are alleged to flow along the same waterways as the stormwater discharges, Plaintiffs also have not established a causal connection between FMC's SPDES discharges and elevated levels of arsenic or other toxins on their properties.

Accordingly, summary judgment is granted on this final federal claim, as well.

### 6.    *The Seventh through Ninth Claims—Claims Under State Law*

Having disposed of Plaintiffs' federal claims, this Court finds it appropriate to decline to exercise supplemental jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c)(3).

The United States Supreme Court has instructed that courts ordinarily should decline to exercise supplemental jurisdiction in the absence of federal claims.  *See* Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) (noting that in the usual case where all federal claims are eliminated before trial, the relevant factors informing the decision of whether to exercise supplemental jurisdiction will "point towards declining to exercise jurisdiction over the remaining state-law claims"); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

The Second Circuit shares this view; where "federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003); *see also*, Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well."); Powell v. Gardner, 891 F.2d 1039, 1047 (2d Cir. 1989) ("in light of proper dismissal of the § 1983 claim against the County, the district court should have declined to exercise pendent jurisdiction over Powell's state-law claims against the County").

Accordingly, this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and will dismiss them pursuant to 28 U.S.C. § 1367(c)(3).

## IV.  CONCLUSION

For the reasons stated, Defendant FMC Corporation's motion to preclude Plaintiffs' expert and for summary judgment is granted in its entirety.

**ORDERS**

IT HEREBY IS ORDERED, that Defendant FMC Corporation's Motion to Preclude Plaintiffs' Expert and for Summary Judgment (Docket No.  85) is GRANTED.

FURTHER, that the Clerk of the Court is directed to enter Judgment for Defendant FMC and close this case.

SO ORDERED.

Dated:        March 29, 2011
                   Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court